FILED
CLERK, U.S. DISTRICT COURT

JUN 6 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SALVADOR RODRIGUEZ,

               Petitioner,

   v.

MIKE D. McDONALD, Warden,

               Respondent.

NO. CV 10-6234-GW(E)

ORDER ADOPTING FINDINGS,

CONCLUSIONS AND RECOMMENDATIONS OF

UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge. The Court approves and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

///
///
///
///

IT IS FURTHER ORDERED that the Clerk serve copies of this Order, the Magistrate Judge's Report and Recommendation and the Judgment herein by United States mail on Petitioner, and counsel for Respondent.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: _June 6_____, 2011.


_____
GEORGE H. WU
UNITED STATES DISTRICT JUDGE

1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10

11   SALVADOR RODRIGUEZ,            )    NO. CV 10-6234-GW(E)
                                    )
12                Petitioner,       )
                                    )
13        v.                        )    REPORT AND RECOMMENDATION OF
                                    )
14   MIKE D. McDONALD, Warden,      )    UNITED STATES MAGISTRATE JUDGE
                                    )
15                Respondent.       )
                                    )
16   _____)

17

18        This Report and Recommendation is submitted to the Honorable

19   George H. Wu, United States District Judge, pursuant to 28 U.S.C.

20   section 636 and General Order 05-07 of the United States District

21   Court for the Central District of California.

22

23                        **PROCEEDINGS**

24

25        Petitioner filed a "Petition for Writ of Habeas Corpus By a

26   Person in State Custody" on August 20, 2010.  Respondent filed an

27   Answer on January 13, 2011.  Petitioner filed a Traverse on March 7,

28   2011.

**BACKGROUND**

A jury found Petitioner guilty of first degree murder (Count 1) and three counts of attempted murder (Counts 2, 3 and 4) (R.T. 6202-06; C.T. 331-40). The jury found true the allegations that: (1) as to the murder count, a principal personally had used a firearm and discharged a firearm causing death or great bodily injury; (2) the attempted murders were wilful, premeditated and deliberate; (3) a principal personally had discharged a firearm in the commission of the attempted murders; (4) the offenses were committed for the benefit of a criminal street gang (R.T. 6202-06; C.T. 331-40). Petitioner received a sentence of 165 years to life (R.T. 7434-35; C.T. 399-405).

The Court of Appeal amended the judgment to alter the sentence calculation in several respects, but otherwise affirmed the judgment (Respondent's Lodgment 11). The California Supreme Court transferred the case back to the Court of Appeal with instructions to vacate its decision and reconsider the case in light of People v. Brookfield, 47 Cal. 4th 583, 98 Cal. Rptr. 3d 535, 213 P.3d 988 (2009) (holding court may not impose both a life term under criminal street gang enhancement statute and a firearm enhancement) (Respondent's Lodgment 13). The Court of Appeal modified Petitioner's sentence in light of People v. Brookfield, but otherwise affirmed the judgment (Respondent's Lodgment 14; see People v. Rodriguez, 2009 WL 4068551, at *14 (Cal. App. Nov. 25, 2009). The California Supreme Court denied Petitioner's petition for review summarily (Respondent's Lodgments 15-16).

///

**SUMMARY OF TRIAL EVIDENCE**

The following factual summary is taken from the opinion of the California Court of Appeal in <u>People v. Rodriguez</u>, 2009 WL 4068551 (Cal. App. Nov. 25, 2009).  <u>See Galvan v. Alaska Dep't of Corrections</u>, 397 F.3d 1198, 1199 & n.1 (9th Cir. 2005) (taking factual summary from Court of Appeal opinion).

1.   *The Shooting*

On the night of December 19, 2004 Rene Elias and Alberto Aragon, members of a tagging crew known by its initials "SAP," were spray-painting walls on Imperial Avenue near Van Buren Street in south Los Angeles.  Rene's brother, Luis Elias,[1] and Alex Contreras were parked and waiting for them nearby in a green Buick.  As a white van with brown stripes drove by, Rene and Aragon headed back to the waiting car.  The van stopped in front of the Buick about 30 to 40 feet away; and two people, a tall, brown-skinned male with a shaved head, wearing a white shirt and holding a chrome revolver, and a short, Hispanic male wearing a hooded sweater, got out.  The man with the gun began shooting as Rene climbed into the back seat and Aragon reentered the

---

[1]   Because Rene and Luis share the same last name, we refer to them by their first names for convenience and clarity (<u>Cruz v. Superior Court</u> (2004) 120 Cal. App. 4th 175, 188, fn. 13.)

3

front passenger seat of the Buick.[2]  Luis, the driver,
ducked to avoid the gunshots, and began backing down the
street.  After driving away, the young men flagged down a
police car.  Aragon, who had been hit in the head by a
single gunshot, was dead.

2.  *The Investigation*

In an initial interview with Los Angeles County
Sheriff's Department detectives after the shooting, Rene
described the shooter as a tall, slim, dark-complexioned
male about 18 years old wearing a white shirt and gray
pants.  Luis gave a similar description, adding that the
shooter's head was shaved.  The second shooter, also a
brown-skinned male, was very short, "almost like a kid."
Rene reviewed some photographs in a book provided by the
detectives but stated he could not identify anyone.

Several days after the shooting deputy sheriffs
observed graffiti in two different places in the
neighborhood that appeared to refer to the shooting.  The
first stated, "RIP SAP Jackel," which was understood to mean
"Rest in peace, SAP tagger Jackel," the moniker for Aragon.

---

[2]     A woman driving past the scene largely confirmed this
account of the shooting, although she mistook Rene, who wore his
hair long, for a woman.  Some testimony suggested there may have
been a third person who got out of the van and that at least two
weapons were fired.  These factual variances do not affect the
resolution of this appeal.

The second featured the letters "CRS," a reference to a
local gang known as the Crazy Riders, followed by the
letters "SAP," which had been crossed out, and the number
187, a reference to the Penal Code section for murder.  A
deputy reported this graffiti to the detectives
investigating the Aragon murder, who interpreted it to mean
a CRS member had killed, or had wanted to kill, an SAP
member.

About the same time, Detective Michael Valento, a
deputy sheriff assigned to the Lennox station gang detail,
reviewed another deputy's report of a December 1, 2004
incident at a home three blocks from the scene of the
shooting.  The deputy had interviewed a number of young men
at the home, including Rodriguez, who admitted his
membership in the CRS gang, and Gabriel Flores, who was a
member of a tagging crew known as a rival of SAP's.  In a
conversation with the reporting deputy, Valento was told the
deputy had logged the license plate of a white van parked in
front of the home.  After tracing the license plate, Valento
learned the van was registered to Flores's father.  Valento
drove to the residence and photographed the van.

In an interview with detectives on December 29, 2004,
Rene identified the van in the photograph as the one
involved in the shooting and stated he was certain about the
identification.  He also stated he had seen someone who
looked like the shooter with other members of the CRS gang

5

1    at an automobile body shop located on Vermont Avenue at 95th

2    Street.[3]  According to Rene, CRS and SAP had been "slashing"

3    or crossing out each other's graffiti for the past month.

4

5        On the evening of December 30, 2004 a patrolling

6    sheriff's deputy saw fresh graffiti on a bus stop depicting

7    the letters "CRS."  The deputy approached a group of

8    Hispanic males standing nearby to inquire about the

9    graffiti.  When they saw the patrol car, the members of the

10   group scattered into an adjacent parking lot.  Because the

11   deputy had observed one of the men, later identified as

12   Edwin Morales, holding a revolver that he discarded as the

13   deputy approached, the deputy chased Morales and detained

14   him.  Morales, who was on probation for felony possession of

15   a sawed-off shotgun, was arrested on a charge of possession

16   of a loaded handgun while on probation.  Rodriguez was also

17   interviewed at the scene and acknowledged his membership in

18   the CRS gang, but was not arrested.

19

20       The revolver recovered from the parking lot, a

21   stainless steel .357 magnum, contained six bullets and

22   matched the description of the gun used in Aragon's murder.[4]

23

24       [3]    According to testimony at trial, Rodriguez's father

25   owned the body shop, which was frequented by Rodriguez and at
     least four of his brothers, in addition to other CRS members.

26
         [4]    At trial, a ballistics expert testified the bullet
27   fragments retrieved from Aragon's head were fired by the gun
     recovered on December 30, 2004.  No fingerprints were found on
28   the gun or on the bullets.

6

The next day Morales was interviewed by Detective Valento
and two detectives from the sheriff's homicide unit
investigating Aragon's murder.  In a videotape that was
played for the jury at trial, Morales denied he was a member
of CRS and claimed to know nothing about the gun, insisting
he had never touched it.  Instead he told the detectives he
had run because he had been smoking marijuana, also a
potential probation violation, and had thrown the marijuana
cigarette, not the gun, to the ground as he ran toward the
parking lot.  The detectives pressured him to talk more
openly, warning him the revolver had been used in a murder
and had been seen in his possession and clearly implying he
could be charged with the murder, even though they later
acknowledged at trial he did not resemble the description of
either perpetrator.  Morales continued to deny any knowledge
about the gun or the murder, and the interview was
terminated.

Detective Valento initially left the room with the
other detectives.  When he returned to escort Morales back
to his holding cell, Morales offered to talk to Valento if
Valento would help him.  After Valento restarted the video
camera, Morales told him his mother lived in the apartment
building he had been standing near when he was arrested.
While waiting for his mother, Morales said, he had been with
his nephew, a CRS gang member; Rodriguez, a CRS member
Morales knew as "Lazy"; Rodriguez's brother Manuel, known as

"Flaco"[5]; and another gang member Morales knew as "Red
Eyes." As they stood and talked, Flaco raised his shirt to
reveal a gun tucked into his waistband; and Lazy said he had
"done another job with that one." Lazy, Flaco and Red Eyes
had been driving around and saw some "enemies" tagging a
wall on Imperial. Lazy got out and shot someone from SAP in
the head. Morales told Valento Lazy and Flaco were CRS
members and he was afraid they would target him or his
family for retribution. He also identified photographs of
Lazy, Flaco and other CRS gang members and told Valento Lazy
stayed with his girlfriend, the sister of Gabriel Flores, at
the Flores home. After the interview, Morales directed
Valento to the Flores home where the white van was parked.

On January 4, 2005 Detective Valento and the homicide
detectives again interviewed Rene and Luis Elias. Valento
inserted photographs of the Rodriguez brothers in the
collection of photographs for Rene to review. Rene,
however, refused to look at the book, stating he was afraid
to leave his children without a father. He would not
indicate whether he recognized a particular photograph
Valento pointed out to him.

///
///

---

[5]     A deputy sheriff testified Manuel Rodriguez had
acknowledged his gang membership and moniker in a stop some
months before the murder. The deputy recorded Manuel's height at
the time as 5 feet, 4 inches.

A search warrant was executed at the Flores home on January 11, 2005. Deputies found two notebooks containing gang symbols and graffiti and photographs depicting Salvador Rodriguez displaying CRS gang signs. The white van, in which spray paint cans were found, was also impounded. Rodriguez was arrested following the search. Another search warrant was executed at the Rodriguez family home, where deputies found bullets for a .357 magnum revolver.

On January 13, 2005 Detective Valento, accompanied by the assistant district attorney assigned to the case, again interviewed Morales. This interview was also videotaped. During the first portion of the interview, Morales recounted the statements he had previously made to Valento concerning Rodriguez's description of the shooting. After Morales finished answering questions about the case, Valento and the prosecutor advised him he would have to testify in court and that Rodriguez, his brother Manuel and Gabriel Flores had been arrested and charged with murder "because of a bunch of other circumstances." Because Morales's name was not yet "out there," they said, if he was willing to work with them, he and his family could be moved to a different residential area for their safety. When Morales admitted he was afraid, the prosecutor explained, "move your mom, move you, and then, you know, we're hoping that you'll cooperate with us, because . . . you've been totally truthful, you said what happen[ed], you said your prints weren't going to be on the gun, they're not on the gun. And so . . . we'll never have

1  to file the case on you, but we do want to know that you're

2  going to cooperate with us."  The prosecutor continued,

3  "We're just trying to tell you that, you know, you were

4  helpful, you were honest, so we're going to let the gun

5  thing slide, but we got to know that you're going to

6  cooperate.  So do you feel like either of us are threatening

7  you in any way?"  Morales answered he did not feel

8  threatened but wanted to talk with his mother before

9  committing to testify for the prosecution.  The prosecutor

10  reiterated the suspects did not yet know about Morales; and

11  Valento concurred, stating he would never do that because

12  "they" could go "switch" his mother "right now."  Valento

13  and the prosecutor also warned Morales to stay out of the

14  gang life when he moved because he would be killed if he

15  came back to the neighborhood.  They concluded the interview

16  after discussing logistics related to moving Morales's

17  family.

18

19  3.  *The Trial*[6]

20

21  Rene and Luis Elias and Alex Contreras all testified

22  reluctantly at trial and professed to remember little about

23  the night of the shooting.  Rene volunteered he was drunk

24  ――――――――――――

25  [6]  Salvador Rodriguez, Manuel Rodriguez and Gabriel Flores
were jointly charged with the murder of Alberto Aragon and the
26  attempted murders of Rene Elias, Luis Elias and Alex Contreras.
The court granted Flores' motion for a separate trial.  Manuel
27  Rodriguez was tried concurrently with Salvador Rodriguez, but the
charges against him were dismissed pursuant to section 1181.1
28  before the case went to the jury.

that night and had been drunk frequently during that period
of time.   None of the victims identified Salvador Rodriguez
or his brother Manuel as the perpetrators.   Excerpts from
the videotapes of Rene's and Luis's interviews with the
detectives were played for the jury, and transcripts of
those excerpts were marked as exhibits and provided to the
jury.

Morales testified for the prosecution.   In support of
his testimony, and with no objection from the defense, the
prosecutor played the entire videotape of his first
interview with detectives.   Predictably, he was subjected to
intensive cross-examination, most of it focused on his own
motivation to avoid being charged with murder and the
People's grant of immunity in exchange for his testimony.
The defense also impeached him with inconsistent statements
he had made during his second interview with Detective
Valento and the prosecutor.   The prosecutor then called
various sheriff's deputies as witnesses, who recounted the
results of their investigation.   Finally, she called Valento
to testify and proffered the videotape of the second
interview she and Valento had conducted of Morales. . . .

Rodriguez did not testify in his own defense.   One of
his brothers, Ismael, a former CRS member, and a second CRS
member each testified Morales himself was a member of CRS
known as "Diablo," an allegation Morales had denied under
cross-examination.   Rodriguez's sister, Maria, testified she

1    saw Detective Valento speaking to Rene, Luis and Contreras

2    in an aggressive manner.  According to her, Valento swore at

3    them and directed them to accuse Rodriguez.  On redirect

4    Valento denied swearing at the witnesses, stating he had

5    always had a friendly relationship with them.

6

7    (Respondent's Lodgment 14, at pp. 2-8; see People v. Rodriguez, 2009

8    WL 4068551, at *1-4).

9

10                    **PETITIONER'S CONTENTIONS**

11

12    Petitioner contends:

13

14    1.  The trial court allegedly violated Due Process by permitting

15    the playing of the unredacted videotape of Morales' January 13, 2005

16    interview,[7] which allegedly contained vouching by the prosecutor

17    (Pet., Ground One, p. 5; Traverse, pp. 7-9);[8] and

18

19    2.  The trial court allegedly violated the Sixth Amendment by

20    refusing to allow defense counsel to reopen the defense case at the

21    close of evidence to call a witness to corroborate the testimony of

22    _____

23    [7]    The Traverse mistakenly identifies this interview as

24    having occurred on January 15, 2005 (see Traverse, p. 7).
     However, it is clear that Petitioner is referring to the

25    January 13, 2005 interview (see Traverse, pp. 7-9).

26    [8]    Although the description of this claim in the Petition
     is somewhat uncertain, the Traverse clarifies that Petitioner

27    contends the unredacted tape contained vouching by the prosecutor
     which assertedly rendered Petitioner's trial unfair (see

28    Traverse, pp. 7-9).

1 | Petitioner's sister that she assertedly heard Detective Valento use

2 | profanity and threaten the Elias brothers and Contreras at the

3 | preliminary hearing (Petition, Ground Two, p. 5; Traverse, pp. 9-15).[9]

4 |

5 | **STANDARD OF REVIEW**

6 |

7 | Under the "Antiterrorism and Effective Death Penalty Act of 1996"

8 | ("AEDPA"), a federal court may not grant an application for writ of

9 | habeas corpus on behalf of a person in state custody with respect to

10 | any claim that was adjudicated on the merits in state court

11 | proceedings unless the adjudication of the claim: (1) "resulted in a

12 | decision that was contrary to, or involved an unreasonable application

13 | of, clearly established Federal law, as determined by the Supreme

14 | Court of the United States"; or (2) "resulted in a decision that was

15 | based on an unreasonable determination of the facts in light of the

16 | evidence presented in the State court proceeding."   28 U.S.C. §

17 | 2254(d); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-26 (2002); <u>Early v.</u>

18 | <u>Packer</u>, 537 U.S. 3, 8 (2002); <u>Williams v. Taylor</u>, 529 U.S. 362, 405-09

19 | (2000).

20 |

21 | "Clearly established Federal law" refers to the governing legal

22 | principle or principles set forth by the Supreme Court at the time the

23 | state court renders its decision.   <u>Lockyer v. Andrade</u>, 538 U.S. 63

24 | (2003).   A state court's decision is "contrary to" clearly established

25 |

26 | ⁹   Although the description of this claim in the Petition
is somewhat uncertain, the Traverse clarifies that Petitioner's
27 | claim concerns the trial court's denial of the defense motion to
reopen, the same claim asserted on appeal and briefed by
28 | Respondent (<u>see</u> Traverse, pp. 10-11).

1 | Federal law if: (1) it applies a rule that contradicts governing

2 | Supreme Court law; or (2) it "confronts a set of facts. . . materially

3 | indistinguishable" from a decision of the Supreme Court but reaches a

4 | different result. <u>See</u> <u>Early v. Packer</u>, 537 U.S. at 8 (citation

5 | omitted); <u>Williams v. Taylor</u>, 529 U.S. at 405-06.

6 |

7 | Under the "unreasonable application prong" of section 2254(d)(1),

8 | a federal court may grant habeas relief "based on the application of a

9 | governing legal principle to a set of facts different from those of

10 | the case in which the principle was announced." <u>Lockyer v. Andrade</u>,

11 | 538 U.S. at 76 (citation omitted); <u>see also</u> <u>Woodford v. Visciotti</u>, 537

12 | U.S. at 24-26 (state court decision "involves an unreasonable

13 | application" of clearly established federal law if it identifies the

14 | correct governing Supreme Court law but unreasonably applies the law

15 | to the facts).

16 |

17 | A state court's decision "involves an unreasonable application of

18 | [Supreme Court] precedent if the state court either unreasonably

19 | extends a legal principle from [Supreme Court] precedent to a new

20 | context where it should not apply, or unreasonably refuses to extend

21 | that principle to a new context where it should apply." <u>Williams v.</u>

22 | <u>Taylor</u>, 529 U.S. at 407 (citation omitted).

23 |

24 | "In order for a federal court to find a state court's application

25 | of [Supreme Court] precedent 'unreasonable,' the state court's

26 | decision must have been more than incorrect or erroneous." <u>Wiggins v.</u>

27 | <u>Smith</u>, 539 U.S. 510, 520 (2003) (citation omitted). "The state

28 | court's application must have been 'objectively unreasonable.'" <u>Id.</u>

1    at 520-21 (citation omitted); see also Waddington v. Sarausad, 555

2    U.S. 179, 129 S. Ct. 823, 831 (2009); Davis v. Woodford, 384 F.3d 628,

3    637-38 (9th Cir. 2004), cert. dism'd, 545 U.S. 1165 (2005).  "Under

4    § 2254(d), a habeas court must determine what arguments or theories

5    supported, . . . or could have supported, the state court's decision;

6    and then it must ask whether it is possible fairminded jurists could

7    disagree that those arguments or theories are inconsistent with the

8    holding in a prior decision of this Court."  Harrington v. Richter,

9    131 S. Ct. 770, 786 (2011).  This is "the only question that matters

10   under § 2254(d)(1)."  Id. (citation and internal quotations omitted).

11   Habeas relief may not issue unless "there is no possibility fairminded

12   jurists could disagree that the state court's decision conflicts with

13   [the United States Supreme Court's] precedents."  Id. at 786-87 ("As a

14   condition for obtaining habeas corpus from a federal court, a state

15   prisoner must show that the state court's ruling on the claim being

16   presented in federal court was so lacking in justification that there

17   was an error well understood and comprehended in existing law beyond

18   any possibility for fairminded disagreement.").

19

20      In applying these standards, the Court looks to the last reasoned

21   state court decision.  See Delgadillo v. Woodford, 527 F.3d 919, 925

22   (9th Cir. 2008).  "Where a state court's decision is unaccompanied by

23   an explanation, the habeas petitioner's burden still must be met by

24   showing there was no reasonable basis for the state court to deny

25   relief."  Harrington v. Richter, 131 S. Ct. at 784.

26

27      Additionally, federal habeas corpus relief may be granted "only

28   on the ground that [Petitioner] is in custody in violation of the

 1 │ Constitution or laws or treaties of the United States."   28 U.S.C. §

 2 │ 2254(a).   In conducting habeas review, a court may determine the issue

 3 │ of whether the petition satisfies section 2254(a) prior to, or in lieu

 4 │ of, applying the standard of review set forth in section 2254(d).

 5 │ Frantz v. Hazey, 533 F.3d 724, 736-37 (9th Cir. 2008) (en banc).

 6 │

 7 │                              DISCUSSION

 8 │

 9 │ I.     The Prosecutor's Alleged Vouching in a Pretrial Interview of

10 │        Morales Does Not Merit Habeas Relief.

11 │

12 │        A.     Background

13 │

14 │        In a pretrial interview of Morales at which Detective Valento and

15 │ the prosecutor were present, the prosecutor stated that she hoped

16 │ Morales would cooperate with the prosecution "because, you know,

17 │ you've been totally truthful. . . ." (C.T. 249).   The prosecutor also

18 │ said Morales had been "forthcoming," "helpful," and "honest" (C.T.

19 │ 250).

20 │

21 │        At trial, during the direct examination of Detective Valento, the

22 │ prosecutor moved to play the entire tape of the January 13, 2005

23 │ interview (R.T. 4223-24).   Over a defense objection, the court

24 │ permitted the tape to be played to the jury (R.T. 4225-27).

25 │ Subsequently, defense counsel moved to strike the tape on the ground,

26 │ inter alia, that the prosecutor allegedly had vouched for Morales'

27 │ truthfulness during the interview (R.T. 4230, 4235-36).   The court

28 │ denied the motion to strike (R.T. 4237).   Defense counsel then moved

1  for a mistrial (R.T. 4237).  The court denied the motion, but

2  suggested a willingness to strike the prosecutor's comment concerning

3  the witness' truthfulness (R.T. 4237).  Both the prosecutor and

4  defense counsel acquiesced in this suggestion (R.T. 4237).  The court

5  thereafter instructed the jury:

6

7       Ladies and gentlemen, during the taping that you heard,

8       this district attorney made a -- stated an opinion as to the

9       truthfulness of the witness, you [sic] should ignore that

10      completely.  What the district attorney thinks is irrelevant

11      to this thing, only what you think is relevant to this

12      thing.  So disregard that remark entirely.

13

14  (R.T. 4239).

15

16      Following the close of evidence, and during a discussion of the

17  prosecution's exhibits, defense counsel objected again to the

18  admission of the tape (R.T. 4803-06).  The court denied the motion,

19  but said that the prosecutor's statement that she assertedly believed

20  Morales should be deleted (R.T. 4814).  The prosecutor said she would

21  "cut out that one snippet" so that the tape could be replayed if the

22  jury requested it (R.T. 4816).  Defense counsel objected, saying the

23  jury had already "heard [sic]" the tape (R.T. 4816).  The court said

24  that the unredacted tape would not be replayed (R.T. 4817).

25  Subsequently, the prosecutor submitted a replacement tape with the

26  prosecutor's "truthfulness" comment redacted (R.T. 5114-15).  The

27  interview transcript was not admitted (R.T. 4814).  Following the

28  verdict, Petitioner moved unsuccessfully for a new trial based on,

17

among other things, the playing of the unredacted tape for the jury
(R.T. 7401-22; C.T. 363-82, 400).

    B.   **Discussion**

    "The prosecutor's vouching for the credibility of witnesses and
expressing his personal opinion concerning the guilt of the accused
pose two dangers: such comments can convey the impression that
evidence not presented to the jury, but known to the prosecutor,
supports the charges against the defendant and can thus jeopardize the
defendant's right to be tried solely on the basis of the evidence
presented to the jury; and the prosecutor's opinion carries with it
the imprimatur of the Government and may induce the jury to trust the
Government's judgment rather than its own view of the evidence."
United States v. Young, 470 U.S. 1, 18 (1985).  "Improper vouching
typically occurs in two situations: (1) the prosecutor places the
prestige of the government behind a witness by expressing his or her
personal belief in the veracity of the witness, or (2) the prosecutor
indicates that information not presented to the jury supports the
witness's testimony."  United States v. Brooks, 508 F.3d 1205, 1209
(9th Cir. 2007) (citation and internal quotations omitted).  Here,
Petitioner alleges the first form of vouching.


    Assuming arguendo that the challenged comments constituted
vouching, Petitioner has not shown that the comments "'so infected the
trial with unfairness'" as to violate due process.  See Curtis v.
Alameida, 244 Fed. App'x 781, 782 (9th Cir. 2007) (quoting Darden v.
Wainwright, 477 U.S. 168, 181 (1986)).  "In analyzing the effects of a

18

prosecutor's vouching, we look to a number of factors, including: the form of the vouching; the degree of personal opinion asserted; how much the vouching implied that the prosecutor had extra record knowledge of the witness' truthfulness; and the importance of the testimony in the overall context of the case. [citations]." United States v. Williams, 989 F.2d 1061, 1072 (9th Cir. 1993).

Here, the alleged vouching did not violate due process. The alleged vouching occurred in the context of a pretrial interview in which the prosecutor and Detective Valento were attempting to persuade Morales to cooperate with the prosecution. See Dubria v. Smith, 224 F.3d 995, 1001-02 (9th Cir. 2000) (en banc) (introduction at trial of pretrial interview in which investigators said that no jury would believe petitioner's story not unlawful; the investigators' comments placed petitioner's responses in context, did not suggest evidence or theories not presented at trial, and "were not the types of statements that carry any special aura of reliability") (citations omitted). The tape containing the alleged vouching was played only once to the jury,[10] and was an isolated incident in a trial that lasted four and a half weeks.[11] See United States v. Wright, 625 F.3d 583, 613 (9th Cir. 2010) (prosecutorial vouching harmless where, among other things, improper statements "were relatively isolated incidents over the course of a ten day trial"); Hein v. Sullivan, 601 F.3d 897, 916 (9th Cir. 2010) (prosecutor's comments did not render trial fundamentally

---

[10]    As Petitioner acknowledges (see Traverse, p. 8), the jury never requested to view the redacted tape.

[11]    Jury selection began on June 28, 2006 (C.T. 164). The jury rendered its verdict on August 1, 2006 (C.T. 335-40).

unfair where they occurred in one paragraph of a lengthy summation
after a two-month trial, did not "pervade the proceedings," and were
not emphasized); <u>United States v. Garcia-Guizar</u>, 160 F.3d 511, 521
(9th Cir. 1998) (isolated incident of vouching in closing argument not
prejudicial even in absence of curative instruction).   Furthermore,
the court instructed the jury to disregard the prosecutor's comment
concerning Morales' truthfulness.[12]   The court also instructed the
jury that the statements of the attorneys were not evidence (R.T.
5554-55; C.T. 295).   The jury is presumed to have followed the court's
instructions.   <u>See Weeks v. Angelone</u>, 528 U.S. 225, 226 (2000); <u>United
States v. Necoechea</u>, 986 F.2d 1273, 1280-81 (9th Cir. 1993)
(instruction that attorney's statements were not evidence ameliorated
effect of alleged vouching).   These curative instructions reduced any
possible unfairness which otherwise might have resulted from the
alleged vouching.   <u>See Hein v. Sullivan</u>, 601 F.3d at 916 (cautionary
instructions mitigated effect of prosecutor's improper comments);
<u>United States v. Necoechea</u>, 986 F.2d 1273, 1280-81 (9th Cir. 1993)
(instruction that attorney's statements were not evidence ameliorated
effect of alleged vouching).

In sum, Petitioner has not shown that the playing of the
unredacted tape of Morales' interview containing the alleged vouching

---

[12]   Although the prosecutor made several remarks concerning
Morales' alleged truthfulness, a reasonable juror would have
understood the court's limiting instruction telling jurors to
disregard evidence of the prosecutor's "opinion as to the
truthfulness of the witness" to apply not only to the
prosecutor's statement that Morales had been "truthful" but also
to her statements that Morales had been "forthcoming," "helpful"
and "honest" (<u>see</u> C.T. 250).

20

1   rendered Petitioner's trial fundamentally unfair.  See Hein v.

2   Sullivan, 601 F.3d at 916.  Because Petitioner has not shown a

3   constitutional violation, Petitioner is not entitled to habeas relief

4   on Ground One of the Petition.  See Frantz v. Hazey, 533 F.3d at 736-

5   37; 28 U.S.C. § 2254(a).[13]

6

7   II.   **The Trial Court's Refusal to Allow Defense Counsel to Reopen the**

8         **Defense Case Does Not Warrant Habeas Relief.**

9

10        A.   **Background**

11

12        Detective Fournier testified that, before the preliminary

13   hearing, Fournier spoke "harshly" to Rene and Luis Elias (R.T. 4210-

14   11).  Fournier said he did so because the witnesses assertedly were

15   "laughing, joking and making a mockery of themselves out in the

16   hallway" (R.T. 4211).  Fournier admitted that "perhaps" he had used

17   profanity, but denied threatening the witnesses (R.T. 4212).  Fournier

18   said he did not know whether Detective Valento had spoken harshly to

19   the Elias brothers before or after the preliminary hearing (R.T.

20   4211).

21

22        Thereafter, on cross-examination of Detective Valento, defense

23   counsel asked: "Isn't it true that you encountered both of the Eelis

24   [sic] brothers in the hallway in the Inglewood courthouse before they

25   testified [at the preliminary hearing] and told them 'you mother

26

27   _____

        [13]    In light of this conclusion, the Court need not, and
28   does not, determine whether the AEDPA standard of review applies
     to this claim.  See Frantz v. Hazey, 533 F.3d at 736-37.

1  fuckers better point the finger.  If you don't I am going to asses

2  [sic] mother fuckers? [sic]'" (R.T. 4515).  Detective Valento denied

3  making these alleged statements (R.T. 4516, 4561).

4

5      The next day, the defense called Petitioner's sister Maria

6  Rodriguez, who testified that, at a preliminary hearing on May 5,

7  2005,[14] she was outside a courthouse conference room when she

8  overheard Detective Valento yelling at the Elias brothers and saying:

9  "You mother fuckers better point the finger.  If not, I am.  You

10 mother fuckers better point the finger.  If not, I am going to fuck

11 you up" (R.T. 4861-63).  On cross-examination Maria said she was not

12 the only person who heard Valento's alleged statement, saying:

13 "Mr. McDonald's the other two lawyers [sic] who were representing my

14 brother and Gabriel's lawyer heard it" (R.T. 4865).[15]  However, asked

15 if Valento made the alleged threat in front of Maria and "the two

16 attorneys," Maria responded: "There was one attorney outside" (R.T.

17 4866).  Maria also said other family members were standing there as

18 well (R.T. 4866).

19

20     The defense then rested (R.T. 4867).  On rebuttal, the prosecutor

21 called Detective Valento, who denied making the statements attributed

22

23     [14]    The record does not contain a transcript of a May 5,
24 2005 preliminary hearing.  The transcript of proceedings on
   September 22, 2005, at which Petitioner waived a preliminary
25 hearing, indicates that there was a previous preliminary hearing,
   and that the case apparently had been refiled subsequently (C.T.
26 3).  The court severed Flores' case from Petitioner's on
   December 16, 2005 (R.T. 30).
27
28     [15]    Attorney McDonald apparently represented Petitioner at
   the time (R.T. 4865).

1  to him by Maria and testified that he had a good relationship with the

2  three witnesses (R.T. 4868).   The prosecution rested, and counsel

3  discussed jury instructions out of the jury's presence (R.T. 4875-

4  4928).

5

6        The following morning, Petitioner's counsel asked to reopen to

7  call attorney Sanz, who was Flores' counsel.   Petitioner's counsel

8  said that Sanz was a percipient witness to the alleged conversation

9  between Detective Valento and the three witnesses at the time of the

10  preliminary hearing (R.T. 5105).   The court requested an offer of

11  proof (R.T. 5106).   Counsel said that Sanz reportedly would testify

12  that: (1) Sanz purportedly was coming out of the courtroom at the time

13  of the preliminary hearing when Sanz allegedly observed Detective

14  Valento with his face "one or two inches" from Rene Elias' face;

15  (2) Rene Elias allegedly was "not backing down"; and (3) after

16  Detective Valento walked away, Elias told Sanz that Valento assertedly

17  had threatened and cursed Elias (R.T. 5107).   The court denied the

18  motion to reopen (R.T. 5107).

19

20        During closing argument, the prosecutor argued that Maria

21  Rodriguez had testified that a Mr. McDonald allegedly was in the

22  hallway when Valento made the alleged comments, and asked

23  rhetorically: "Where is Mr. McDonald?   Where is he?" (R.T. 5153).

24  Defense counsel objected (R.T. 5153).   The court overruled the

25  objection and denied defense counsel's motion to reopen to present

26  Sanz' proposed testimony, stating that Sanz' proposed testimony was

27  hearsay (R.T. 5154-57).

28  ///

23

1    The Court of Appeal ruled that the trial court had not abused its
2  discretion in denying the motion to reopen, because the proposed
3  testimony would have been inadmissible hearsay (Respondent's Lodgment
4  14, pp. 17-18; see People v. Rodriquez, 2009 WL 4068551, at *10).
5
6  **B.   Discussion**
7
8    The correctness of a state evidentiary ruling presenting only an
9  issue of state law is not reviewable on federal habeas corpus.
10 Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  In limited
11 circumstances, however, the exclusion of crucial evidence may violate
12 the Constitution.  See Holmes v. South Carolina, 547 U.S. 319, 319
13 (2006) ("[w]hether rooted directly in the Due Process Clause of the
14 Fourteenth Amendment, or in the Compulsory Process or Confrontation
15 clauses of the Sixth Amendment, the Constitution guarantees criminal
16 defendants a meaningful opportunity to present a complete defense")
17 (citations and internal quotations omitted); Chambers v. Mississippi,
18 410 U.S. 284, 302 (1973) ("Chambers"); Chia v. Cambra, 360 F.3d 997,
19 1003 (9th Cir. 2004), cert. denied, 544 U.S. 919 (2005) ("The Supreme
20 Court has made it clear that the erroneous exclusion of critical,
21 corroborative defense evidence may violate both the Fifth Amendment
22 due process right to a fair trial and the Sixth Amendment right to
23 present a defense.") (citations and internal quotations omitted).
24
25   "It is clearly established federal law, as determined by the
26 Supreme Court, that when a hearsay statement bears persuasive
27 assurances of trustworthiness and is critical to the defense, the
28 exclusion of that statement may rise to the level of a due process

1  violation." <u>Chia v. Cambra</u>, 360 F.3d at 1003 (citing <u>Chambers</u>, 410

2  U.S. at 302). However, "<u>Chambers</u> . . . does not stand for the

3  proposition that the defendant is denied a fair opportunity to defend

4  himself whenever a state . . . rule excludes favorable evidence."

5  <u>United States v. Sheffer</u>, 523 U.S. 303, 316 (1998). "While the

6  Constitution . . . prohibits the exclusion of defense evidence under

7  rules that serve no legitimate purpose or that are disproportionate to

8  the ends that they are asserted to promote, well-established rules of

9  evidence permit trial judges to exclude evidence if its probative

10  value is outweighed by certain other factors such as unfair prejudice,

11  confusion of the issues, or potential to mislead the jury." <u>Holmes v.</u>

12  <u>South Carolina</u>, 547 U.S. at 320 (citations omitted); <u>see also</u> <u>Moses v.</u>

13  <u>Payne</u>, 555 F.3d 742, 758 (9th Cir. 2009). Thus, "the Constitution

14  permits judges to exclude evidence that is repetitive . . . , only

15  marginally relevant or poses an undue risk of harassment, prejudice or

16  confusion of the issues." <u>Holmes v. South Carolina</u>, 547 U.S. at 326-

17  27 (citations, internal brackets and quotations omitted).

18

19      Petitioner has not shown that the proffered testimony was

20  critical to his defense. The excluded testimony was offered to

21  corroborate Maria Rodriguez' testimony, to impeach Detective Valento's

22  denial of the alleged statements, and to support Petitioner's theory

23  that Valento supposedly had pressured witnesses to lie, most notably

24  Morales. However, Sanz' hearsay testimony was not the only evidence

25  reportedly available to attempt to accomplish these goals. Defense

26  counsel could have questioned the Elias brothers or Contreras, all

27  three of whom testified at trial, regarding Valento's alleged

28  statements. Counsel also could have called one of the family members

whom Maria testified were standing outside the conference room when
the alleged statements were made.[16]   Indeed, the trial court indicated
it probably would have allowed non-hearsay testimony on the subject
(R.T. 5157).

Moreover, the proposed testimony was too attenuated to have
significant probative value concerning the defense theory that
Detective Valento purportedly had compelled witnesses to implicate
Petitioner falsely.   Evidence that, at the preliminary hearing,
Valento assertedly told the witnesses to "point the finger" and made a
vague, profane threat, did not necessarily show that the detective
pressured the witnesses to _lie_.   Rather, the proffered evidence
reasonably could have been interpreted to show that Valento was
attempting to pressure the witnesses (whom Fournier testified without
contradiction were not treating the proceedings seriously) to
cooperate by telling the truth.

The record shows that, from the outset, the three witnesses
evinced reluctance to cooperate.   Detective Fournier testified that
Rene Elias initially was uncooperative (R.T. 3919).   Rene himself
admitted that his "story changed" after the first interview,
acknowledging that police arrested him when they reportedly found out
that Rene allegedly had lied about the identity of the driver of the
Buick (Rene's twin brother) (R.T. 2402, 2409-11, 2424).   Luis
testified that he did not want to testify and did not like helping the
prosecution or the police (R.T. 2475).   In pretrial interviews on

---

[16]   The record is unclear whether counsel attempted to
contact Mr. McDonald (_see_ R.T. 5106)

1  December 29, 2004, the Elias brothers described the shooters with some

2  specificity as to garb, height and body size (see C.T. 199-205, 220-

3  22, 227-29).[17]   Rene Elias also said he had seen one of the shooters

4  once or twice previously hanging out with the Crazy Riders at a shop

5  (see C.T. 214-17, 222).[18]  However, neither Rene nor Luis identified

6  anyone in photo lineups (R.T. 2486, 3954-55, 3980-81).  On

7  December 23, 2004, Rene allegedly reviewed only a few pages of a mug

8  book, and on January 4, 2005, he allegedly refused to look at the mug

9  book at all (R.T. 3946, 3954-55, 3980-81, 4219-21).  Rene also

10  testified that, during the latter interview, Detective Valento

11  purportedly insinuated that Rene was not telling the truth (R.T. 2406-

12  07).  Contreras initially identified the shooters only as males, and

13  never made himself available for a subsequent interview (R.T. 2715,

14  3728, 3920-21, 4203-04).[19]

15  ///

16  ///

17

18  [17]    In a December 29, 2004 police interview, Rene said that
one man was a dark-skinned Hispanic in a white shirt and gray

19  pants, approximately eighteen years old, and that the other was a
slim "little short guy" in a black hoodie (C.T. 199-200, 205,

20  208, 220).  In an interview on the same day, Luis said one man
was a "little short guy" wearing a black hat and "hood sweater"

21  who appeared to be a "little kid" under eighteen, and the other
was a thin light-skinned Hispanic wearing a white shirt with a

22  shiny shaved head approximately 5'10" or 5'11," who appeared to
be over seventeen (C.T. 224-28).

23

24  [18]    At trial, Rene identified the shop as an auto body shop
owned by Petitioner's father, but denied telling detectives that

25  he previously had seen one of the assailants at the shop.
Rather, Rene testified that he told the detectives he had seen

26  the big brothers of Petitioner and his co-defendant Manuel
Rodriguez at the shop (R.T. 2165-69, 2172).

27

28  [19]    A deputy said Contreras appeared "very nervous" during
the initial interview at the crime scene (R.T. 2718).

1    This evidence suggests that, by the time of the May 5, 2005
2  preliminary hearing, Detective Valento had good reason to believe that
3  the witnesses might not cooperate and testify truthfully to what they
4  had seen.   In these circumstances, hearsay evidence that Detective
5  Valento supposedly exhorted the witnesses to "point the finger" during
6  the preliminary hearing was only weakly probative of Petitioner's
7  defense theory that Valento pressured witnesses to testify falsely at
8  trial.   Thus, the excluded testimony was not critical to Petitioner's
9  defense.[20]

10

11    For the foregoing reasons, the Court of Appeal's rejection of
12  this claim was not contrary to, or an objectively unreasonable
13  application of, any clearly established Federal law as determined by
14  the United States Supreme Court.   See 28 U.S.C. § 2254(d); Harrington
15  v. Richter, 131 S. Ct. at 785-87.   Petitioner is not entitled to
16  habeas relief on Ground Two of the Petition.

17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///

24  _____

25    [20]    The fact that Rene testified at the preliminary hearing
   that both shooters were tall and wore hoods suggests the
26  reasonableness of any fears the detectives may have had that Rene
   would not testify truthfully at that hearing (see R.T. 4205,
27  4210).   At trial, Rene said he did not recall his preliminary
   hearing testimony that both suspects were tall, but admitted that
28  such testimony was untrue (R.T. 2219).

**RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) denying and dismissing the Petition with prejudice.

DATED: March 24, 2011.

_____/S/_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the Court of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrate Judges and review by the District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.

If the District Judge enters judgment adverse to Petitioner, the District Judge will, at the same time, issue or deny a certificate of appealability.  Within twenty (20) days of the filing of this Report and Recommendation, the parties may file written arguments regarding whether a certificate of appealability should issue.